```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
SOWANY MONTILLA,
                                :
                Plaintiff,           REPORT & RECOMMENDATION
                                :
        -against-                    13cv7012 (LTS)(MHD)
                                :

COMMISSIONER OF SOCIAL SECURITY, :

                Defendant.       :
-------------------------------x
```

TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:


    Plaintiff Sowany Montilla[1] filed this pro se action pursuant to section 205(g) of the Social Security Act, as amended, 45 U.S.C. § 405 (g) ("the Act"), to challenge a final decision of the Social Security Administration ("SSA") denying her application for an award of Supplemental Security Income ("SSI") benefits under the Act. Defendant has moved for judgment on the pleadings.


    For the reasons set forth below, we recommend that the defendant's motion be denied, and that the case be remanded for further consideration.

---

[1] Plaintiff may have changed her name in the course of these proceedings, as she listed her name in her August 2012 request to the Appeals Board for review of her hearing as Sowany E. Escoto. (Tr. 110). This name is not found elsewhere in the record, and her complaint filed in this matter on October 2, 2013 had the name Sowany Montilla.

## I.   BACKGROUND

### A. The Procedural History

Ms. Montilla filed an application for SSI benefits on October 8, 2009. (Administrative Record ("Tr.") 118). She listed September 21, 2008 as her disability onset and sought an award of benefits from that date forward. (Id. at 9, 114, 118). The SSA denied her application after initial review on January 6, 2010. (Id. at 9, 118). Plaintiff then requested a hearing before an administrative judge to review the adverse determination. (Id. at 9, 110).

On January 26, 2011, Administrative Law Judge ("ALJ") Paul A. Heyman conducted a hearing on plaintiff's application. (Tr. 24). Plaintiff was not represented by counsel, and requested an adjournment to locate an attorney. (Id. at 24-25). The hearing was adjourned and rescheduled for April 21, 2011. (Id. at 93). At the rescheduled hearing, plaintiff was again unrepresented but elected to proceed. (Id. at 29-30). Following the hearing, ALJ Heyman issued a decision on November 18, 2011, finding that Ms. Montilla was not disabled. (Id. at 6-18). The Appeals Council denied plaintiff's request for review on August 5, 2013, making the Commissioner's determination final. (Id. at 1).

**B. The Pertinent Record**

**1. Plaintiff's Testimony at the Hearing and Submissions**

At the time of her hearing Ms. Montilla resided in the Bronx, renting a room from her aunt. (Tr. 31). She completed high school and one semester of college. (Id. at 32). She was 22 years old at the time of claimed onset of disability. (Id. at 118). She is unmarried and has no children. (Id. at 51).

Ms. Montilla testified that she is unable to work due to injuries suffered as a result of receiving an electric shock from exposed wires in 2008. (Tr. 34-35). According to a Work History Report, prior to the accident plaintiff had worked in retail as a cashier at $8.50 per hour during the summer of 2005 for 30 hours per week, and in a restaurant as a coat checker and food runner at $10.00 per hour between October 2003 and June 2004 for fifteen hours per week. (Id. at 141-48). Her Work History Report does not indicate that she was employed between September 2005 and October 2008, but plaintiff testified that from 2006 to 2008 she worked on commissions for a marketing company named TOP. (Id. at 33-34). According to the Disability Report SSA-3368 completed by plaintiff, after the accident she returned to work in November 2008, stopped due to pain in January 2009, started working again for approximately one month in June 2009, and attempted to work

again in September 2009, working for three weeks before she needed to stop due to her ailments. (Id. at 150).

Ms. Montilla testified that she cannot work because she has pain and headaches emanating from her left eye caused by bright lights or being in front of a computer, stuttering and speech problems, nerve damage which causes her back to go numb, making it difficult to sit up straight, as well as numbness and tingling in her face, left arm, and left leg. (Tr. 34, 37-38, 42-45). Plaintiff explained that sunshine and television glare also affect her left eye so that she must wear sunglasses even when it is not too sunny, and she cannot read for more than five minutes without feeling pain in her eye. (Id. at 37-38, 48). In addition, plaintiff described the tingling sensation in her left arm and back as noticeably painful ten times a day. (Id. at 40). When asked to describe the severity of the pain over a twelve-hour period, plaintiff testified that its severity varied, as the numbness and tingling alternates with shooting pain 8-10 times in 12 hours. (Id. at 40-41). In addition, while plaintiff's left arm and head hurt the worst, there are times when the pain spreads to her chest, left leg, and back. (Id. at 42-43).

4

Plaintiff testified that she takes Lyrica[2] which causes side effects such as memory loss, inability to focus, and difficulty controlling her bowels and bladder. (Id. at 43-44). In the Function Report completed by a friend of plaintiff, plaintiff indicated that she needs reminding to take her medicine and that she forgets what she is saying in the middle of a conversation. (Id. at 132, 137). She also testified to having taken the prescription drugs Neurotonin[3] and Cymbalta.[4] (Id. at 51). She described these medications as less effective than Lyrica and that Cymbalta, in particular, gave her unpleasant side effects of sleeplessness and restlessness. (Id. at 51-52). She also asserted that Lyrica was making her infertile. (Id. at 51).

Ms. Montilla testified that she is unable to do many of the activities she used to enjoy, such as riding her bike, playing sports such as handball or basketball, and reading. (Tr. 46-47). Plaintiff expressed her frustration at having these activities foreclosed to her because of her symptoms. (Id. at 46). She also expressed her frustration and depressive feelings at not being

---

[2] Lyrica is the brand name for pregabalin, an anticonvulsant medication used to treat seizures and neuropathic pain. "Lyrica," Drugs.com, http://www.drugs.com/lyrica.html (last visited May 1, 2015).

[3] Neurotonin is the brand name for gabapentin, an anticonvulsant used to treat seizures and nerve pain. "Neurotonin," Drugs.com, http://www.drugs.com/neurontin.html (last visited May 1, 2015).

[4] Cymbalta is the brand name for duloxetine, a selective serotonin and norepinephrine reuptake inhibitor antidepressant. "Cympbalta," Drugs.com, http://www.drugs.com/cymbalta.html (last visited May 1, 2015).

able to work. (Id. at 46, 53).  She testified that she is generally considered to be antisocial and spends her time alone or in the company of only one or two intimates. (Id. at 49-50). Plaintiff testified that she had been advised to seek psychological treatment, and that at the time of the hearing she had scheduled her first appointment. (Id. at 46).[5]

Ms. Montilla testified that she can travel by subway or bus, but indicated that she needs someone to do her hair.  (Tr. 31-32, 132). Plaintiff also indicated that she has difficulty cooking meals for more than five to ten minutes because her arm is sensitive to the heat of the stove. (Id. at 132). She also requires assistance with housework and cannot do laundry or cleaning. (Id. at 133). However, plaintiff is able to shop for necessities and food. (Id. at 134).

### 2. Medical Records: Treating Physicians

#### a. New York Presbyterian Emergency Department

Just after midnight on September 26, 2008 plaintiff sought treatment at New York Presbyterian Emergency Department with symptoms of "pins/needles" in her left arm and dizziness that she

---

[5] It is not clear from the transcript with whom this appointment was scheduled -- the ALJ did not inquire further and there is no evidence in the record of a treating psychotherapist, although a consulting psychotherapist did evaluate Ms. Montilla in June of 2011. (See section II.C.2, infra).

attributed to an electric shock injury. (Tr. 198-204). She reported dull pain as a five or six on a ten-point scale, and the hospital noted a history of asthma. (Id. at 198). The hospital conducted an ECG,[6] the results of which were normal. (Id. at 203-04). The discharge record indicated no obvious signs of entry or exit for the electric shock, nor were there burn signs, which the care provider inferred to mean a low voltage injury. (Id. at 202). Plaintiff was instructed to take Tylenol for pain and to "drink plenty of fluids," and she was released less than seven hours after admission. (Id.).

On October 2, 2008 plaintiff returned to New York Presbyterian complaining of tingling in her left arm and left thigh related to the alleged electric shock of a week earlier, but minimal pain. (Tr. 205-213). The hospital conducted an ECG and a urinalysis, both of which were normal. (Id. at 211, 213). The physical examination found no forearm or upper-arm tenderness or swelling and indicated that she had a normal gait. (Id. at 206). She was discharged less than nine hours later with instructions to take Motrin. (Id. at 207).

---

[6] ECG is an electrocardiogram, "which measures the net electrical activity that causes cardiac muscle contractions necessary to pump blood, remains a primary diagnostic tool for most cardiovascular disorders." 8 Attorneys Medical Advisor § 85:32.

### b. Jose A. Acevedo, M.D.

On February 4, 2009 Ms. Montilla saw Dr. Jose Acevedo[7] for a neurology consult and then on February 9, 2009 for neurological tests. (Tr. 214-24). Dr. Acevedo's notes indicate that a Dr. Shah had referred Ms. Montilla. (Id. at 215, 221-22). Dr. Acevedo diagnosed an injury of the left brachial plexus[8] with paresthesias.[9] (Id. at 217). He prescribed two tests, an EMG[10] and a nerve conduction velocity test,[11] the medication Neurotonin, and rest. (Id.). Dr. Acevedo reported the test results as normal. (Id. at 221-24).

There is one anomaly in the records provided by Dr. Acevedo. He provided copies of three prescriptions written on February 4,

---

[7] Dr. Jose A. Acevedo is a neurologist practicing in New York, NY. "1568455525 NPI number — JOSE A ACEVEDO MD," HIPAA Space, http://www.hipaaspace.com/Medical_Billing/Coding/National_Provider_Identifier /Codes/NPI_1568455525.txt (last visited May 1, 2015).

[8] The physician's handwriting is difficult to interpret, but "left brachial" is clear. The brachial plexus is a network of nerves that send signals from the spine into the shoulder, arm, and hand, and minor injuries to this network are called "stingers" or "burners." "Brachial Plexus Injury," Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/home/ovc-20127336 (last visited May 1, 2015).

[9] Paresthesia is an "[a]bnormal sensation, such as burning, tingling, and numbness. 7 Attorneys Medical Advisor § 65:6.

[10] An electromyogram (EMG) tests neuromuscular function by "placing needle electrodes in the muscles to detect the nerve impulses transmitted to them when the patient voluntarily uses the muscles or is at rest." 2 Attorneys Medical Advisor § 20:21.

[11] A Nerve conduction velocity test "is ordinarily administered to patients with symptoms like weakness or paralysis in one body area, tingling, numbness or pain. By measuring the time it takes an electrical impulse to travel along a nerve after the nerve has been stimulated, the test excludes or minimizes the possibility of the symptoms being caused by certain underlying disorders." 2 Attorneys Medical Advisor § 20:21

2009 for a patient named ████████ which is not a name that otherwise appears in the record. (Tr. 214).

### c. Jackson Memorial Hospital Emergency Room

On June 29, 2009 Ms. Montilla sought treatment at the emergency room of Jackson Memorial Hospital in Miami, Florida, for a headache and left arm numbness. (Tr. 225-36). The hospital conducted a CT[12] brain image, in addition to a blood panel[13] and urine tests. (Id. at 229-32). The CT imaging did not reveal any abnormal findings, nor were any concerns indicated regarding her blood and urine tests. (Id. at 232-33). The last note regarding her treatment was posted in the morning of June 20, 2009, which we infer to be the time of her discharge. (Id. at 232).

### d. Aric Hausknecht, M.D. and Jason Maas

Ms. Montilla sought treatment twice from Dr. Aric Hausknecht,[14] a neurologist at Complete Medical Care Services, P.C., on September 29, 2009 and December 8, 2009. (Tr. 237-41).

---

[12] Computerized axial tomography, or CT imaging, "involves taking x-rays from many different angles by having the x-ray tube and electronic x-ray detectors move simultaneously, feeding the image data into a computer, and generating a high resolution composite image from the computer." 2 Attorneys Medical Deskbook § 21:4.

[13] A comprehensive blood panel is a measure of the amounts of different chemicals and minerals in the blood. 2 Attorneys Medical Deskbook § 19:31.

[14] Dr. Aric Hausknect is a board-certified neurologist practicing in New York, NY and Hewlett, NY. "Is Your Doctor Board Certified," Certification Matters, https://www.certificationmatters.org/is-your-doctor-board-certified/search-now/ln/hausknecht/fn/aric.aspx (last visited May 1, 2015).

Dr. Hausknecht took a patient history and conducted a physical examination at the September visit and determined that her vital signs and systems were normal. (Id. at 238). He noted that Ms. Montilla had seen Dr. Acevedo for treatment, but that she "did not have any form of coverage and was unable to treat." (Id.). In his neurologic examination of the patient Dr. Hausknecht observed normal mental status and no problems in her cranial nerves. (Id. at 239). As to plaintiff's motor system and reflexes, Dr. Hausknecht observed atrophy in her left hand and reflexes of two on a four-point scale. (Id. at 239). Dr. Hausknecht further observed "hypoesthesia[15] to light touch in a glove-like distribution in the left arm." (Id.). Mechanical and range-of-motion tests were normal. (Id. at 239-40). Dr. Hausknecht indicated that EMG and a nerve-conduction velocity test were warranted to evaluate nerve damage, and he suggested physical therapy for her left arm and medications directed at her neuropathic[16] pain. (Id. at 240). Although the available record is silent on prescriptions, we infer that Dr. Hausknecht prescribed some form of medication, because on her follow-up visit in December his notes indicated that Ms. Montilla had "run out of medications." (Id. at 237).

---

[15] Hypoesthesia means numbness or decreased sensation of a stimulus. 2 Attorneys Medical Deskbook § 24:23.

[16] Neuropathic means "pertaining to or characterized by . . . a functional disturbance or pathological change in the peripheral nervous system." Dorland's Illustrated Medical Dictionary 1132 (1994).

In a subsequent visit with Dr. Hausknecht on December 8, 2009, plaintiff reported that she still experienced pins and needles in her left arm, and that it had progressed to her right arm. (Tr. 237). Dr. Hausknecht found plaintiff to have pain-related "weakness in the left upper extremity" but with her reflexes and senses intact. (Id.). He advised Ms. Montilla to take over-the-counter anti-inflammatory and analgesics as needed for her pain. (Id.). Dr. Hausknecht recorded that plaintiff's symptoms persisted, noted that she had run out of medication and advised her to take anti-inflammatory and analgesic agents for pain. (Id. at 237). Dr. Hausknecht opined that plaintiff was partially disabled and her condition is causally related to the injury sustained on September 22, 2008. (Id.).

Plaintiff indicated on the Claimant's Recent Medical Treatment Form that she saw Physician Assistant Jason Maas[17] at some point after February 20, 2010. (Tr. 183). Plaintiff listed Mr. Maas's address as 19 E. 37th Street, New York, NY. (Id.). This address is the same as one of the three office locations listed on Dr. Hausknecht's professional letterhead (see id. at 237-238), allowing us to infer that Mr. Maas is a Physician Assistant working

---

[17] Jason Maas is a Physician Assistant in New York. "1114252780 NPI number — MR. JASON MAAS PHYSICIAN ASSISTANT", HIPAA Space, http://www.hipaaspace.com/Medical_Billing/Coding/NPI/Codes/NPI_1114252780.asp (last visited Apr. 29, 2015).

under Dr. Hausknecht's supervision. Plaintiff reported that Mr. Maas had prescribed cyclobenzaprine[18] for her on December 6, 2010. (Id. at 187). There are no records from Dr. Hausknecht to corroborate plaintiff's information.

### e. Ranga C. Krishna, M.D.

Ms. Montilla consulted Dr. Ranga Krishna,[19] a neurologist at Westchester Medical Center, on February 1, 2011 and February 25, 2011 with complaints of "temporal headache, neck pain and lower back pain associate[d] with numbness and tingling sensation." She reported pain of seven on a ten-point scale. (Tr. 276-84).[20] There are notations on a billing report that there were additional treatments on March 23, 2011 and June 15, 2011; however, there are no treatment records corresponding to those dates. The ALJ twice issued a subpoena to Westchester Medical Care for plaintiff's records -- on April 28, 2011 and again on July 29, 2011 (id. at 101, 104) -- which would have covered any records from March and June of that year, but only received a response to the July

---

[18] Cyclobenzaprine, generic name for Amrix, Fexmid, and Flexeril, is a muscle relaxant frequently used as an adjuvent analgesics when muscle spasm is a component of pain. § 26:28 Attorney's Medical Deskbook 4th.

[19] Dr. Ranga C. Krishna is listed as a specialist in neurology and pain management practicing at Westchester Medical Care in the Bronx, NY. "Westchester Medical Care," WebMD, http://doctor.webmd.com/practice/westchester-medical-care-f0f055c8-4703-e211-a42b-001f29e3eb44-physicians/alpha/all (last visited May 1, 2015).

[20] This citation provides the complete record provided by Westchester Medical Care and Dr. Krishna. Less complete portions of records from Westchester Medical Care can be found at Tr. 252-56, 285-92).

subpoena. The materials provided in response to that subpoena do not contain any treatment notes from March or June of 2011. (Id. at 284-92).

Dr. Krishna noted plaintiff's history of asthma. (Tr. 276). He reported diagnostic tests that included a brain MRI[21] dated April 4, 2010, a cervical spine MRI from January 20, 2010, and an MRI of the lumbar spine dated July 20, 2010. (Id. at 277). While the brain MRI was unremarkable, the cervical- and lumbar-spine MRIs revealed disc herniation[22] and impingements of nerves on the right side in plaintiff's neck and posterior disc bulging and mild stenosis[23] in her lower back. (Id.). Plaintiff's mental status was normal, as was her cranial nerve examination. (Id. at 277-78). Dr. Krishna noted weakness in the left upper and lower extremities, as well as a subjective sense of dizziness and antalgic[24] gait. The doctor also reported range of motion results below normal in plaintiff's neck and lower back. (Id. at 278).

---

[21] Magnetic Resonance Imaging ("MRI") is based on "the response of atomic nuclei to radio waves while the patient is inside a strong magnetic field." 2 Attorneys Medical Deskbook § 21:7.

[22] A "herniated disc" is "general term that means any extension of a disk beyond the margin of an adjacent vertebral body. 2 Attorneys Medical Deskbook at § 24:17.

[23] Spinal stenosis is a form of neuropathic pain, similar to radiculopathy. 2 Attorneys Medical Deskbooks § 26:8. See infra note 25.

[24] Antalgic means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary 90.

Dr. Krishna found that the herniated discs and bulges were consistent with the radiculopathy[25] that plaintiff experienced, and he recommended further tests to rule out nerve dysfunction as a source of her dizziness and headaches. (Id. at 278). Dr. Krishna indicated that plaintiff "should continue chiropractic adjustments, physical therapy in the frequency of 3 times for 4 weeks" and follow up in four weeks with him. (Id.). He indicated a "guarded" prognosis. (Id. at 279). There is no indication that he prescribed any medication.

Plaintiff followed up with Dr. Krishna on February 25, 2011, and reported no change in her symptoms since February 1, 2011. She again indicated pain of seven on a ten-point scale. (Tr. 280). The doctor summarized the same MRI results described in his report on February 1, 2011 and reported range-of-motion measures largely the same, as well. (Id. at 281). He recommended continuation of physical therapy for her neck twice a week and prescribed Lyrica. (Id. at 282). Dr. Krishna indicated that plaintiff should consult for pain management and follow up with him in a month. (Id.).

---

[25] Radiculopathy is a form of neuropathic pain -- that is, "pain from dysfunction of some component of the nervous system. This pain may be greatly amplified by psychological stress that activates arousal systems in the nervous system. Neuropathic pain tends to be chronic and difficult to treat, requiring higher doses of analgesic drugs for control than does nociceptive pain. a. nerves that are compressed, as with carpal tunnel syndrome or spinal nerve root compression, b. nerves that are chemically damaged, as with diabetic neuropathy or post-herpetic neuralgia, c. nerves that are physically damaged, as with direct trauma or multiple sclerosis." 2 Attorneys Medical Deskbook § 26:8.

Finally, the doctor opined that Ms. Montilla "should avoid bending, twisting, lifting, climbing stairs, operating heavy machinery, prolonged sitting and standing" for an indefinite period. (Id.).

### f. Dr. Sangita Shah

Ms. Montilla listed Dr. Sangita T. Shah[26] and his address on the Claimant's Recent Medical Treatment form. (Tr. 183). This form provided information supplementing plaintiff's record from the last update to her record on February 20, 2010. (Id.). Additionally, on the Claimant's Medication Form, plaintiff reported that Dr. Shah had prescribed "butal-caf-apap-cod-cap"[27] for her on October 22, 2010. (Id. at 187). There is a mention in Dr. Acevedo's treatment records that a Dr. Shah referred the patient to him for a neurological evaluation. (Id. at 215, 221). However, there are no treatment records for Dr. Shah, and there is no indication that the ALJ attempted to subpoena these records.

---

[26] Dr. Sangita T. Shah is president of Sheldon Medical Care and specializes in internal medicine. "1467718247 NPI number — SHERMAN MEDICAL CARE, PC," HIPAA Space,
http://www.hipaaspace.com/Medical_Billing/Coding/National_Provider_Identifier
/Codes/NPI_1467718247.txt (last visited Apr. 29, 2015).

[27] This appears to be butalbital with codeine, the generic name for Fioricet with Codeine, which treats tension headaches. "Acetaminophen/ butalbital/ caffeine/ codeine," Drugs.com.
http://www.drugs.com/cdi/acetaminophen-butalbital-caffeine-codeine.html (last visited Apr. 29, 2015).

### 3. Medical Records: Consulting Physicians and Mental Health Professionals

Two consultants provided examinations and reports on Ms. Montilla's conditions at the behest of the ALJ. (Tr. 55, 257-74). Both examinations are dated June 3, 2011, and both consultants are employed by Industrial Medicine Associates, P.C. (Tr. 257-66, 268-74).

### a. Consulting Physician Dr. Aurelio Salon

Dr. Aurelio Salon conducted a neurologic consultation examination of Ms. Montilla on June 3, 2011. (Tr. 257-66). This consultant took a medical history and detailed plaintiff's symptoms and current physical functioning. (Tr. 257-58, 266). He conducted a physical examination and found a normal gait, range of motion, strength, and muscle tone. (Id. at 258, 259). He also found no suggestion of memory impairment or other mental impairment, and found that plaintiff had 20/20 vision in both eyes. (Id. at 258). Plaintiff was also found to have normal sensation to light touch. (Id. at 259). He noted that plaintiff was able to change for the exam and get on and off the exam table without difficulty. (Id. at 258).

Dr. Salon stated that "there are no objective findings to support the fact that claimant would be restricted in her ability

to sit or stand, or in her capacity to climb, push, pull, or carry heavy objects." (Tr. 259). However, the consultant recommended that Ms. Montilla should avoid dust and other known respiratory irritants due to her history of bronchial asthma. (Id.). He described plaintiff's prognosis as "fair." (Id.).

In evaluating Ms. Montilla's ability to do work-related functions, Dr. Salon indicated that plaintiff can lift or carry up to 20 pounds continuously, and 21 to 100 pounds occasionally. (Tr. 261). He also indicated that plaintiff can sit, stand and walk uninterrupted for 8 hours each. (Id. at 262). Dr. Salon noted no limitations on the use of plaintiff's right or left hand or on postural activities, such as climbing, balancing, stooping, kneeling, crouching, or crawling. (Id.). Dr. Salon also found no impairments affecting plaintiff's hearing or vision. (Id.). Finally, he indicated no environmental limitations with regard to unprotected heights, moving mechanical parts, or operating a motor vehicle. (Id. at 265). However he did note that, in light of plaintiff's history of asthma, she cannot tolerate humidity, dust, extreme cold, extreme heat, or vibrations. (Id.).

### b. Consulting Psychologist Jemour Maddux

Consulting Psychologist Jemour Maddux[28] conducted a psychiatric evaluation of Ms. Montilla on June 3, 2011. (Tr. 268-275). Dr. Maddux recorded plaintiff's psychiatric history, medical history, and her current symptoms in an in-person visit. (Id. at 268-270).

Plaintiff reported to Dr. Maddux that she had difficulty sleeping and problems with binge eating, as well as feelings of frustration, anxiety, tearfulness, and mood swings. (Tr. 268). She denied suicidal ideation, panic attacks, and thought disorder symptoms, but stated that she occasionally experiences disorientation. (Id. at 269). He noted that Ms. Montilla's demeanor and responsiveness to questions was cooperative, and overall her presentation skills were adequate. (Tr. 269). He also noted that her speech was fluent, and her gait, posture and motor behavior were appropriate. (Id.). Plaintiff's attention, concentration and recent and remote memory skills were all intact, and he deemed her cognitive function average, and her insight and judgement fair. (Id. at 269-70).

---

[28] Dr. Jemour Maddux is a licensed psychologist practicing in New York and New Jersey. Lamb and Maddux, LLC. Forensic Psychology and Expert Testimony, http://www.lambmadduxgroup.com/ (last visited May 1, 2015).

Dr. Maddux opined that Ms. Montilla's condition was consistent with the stress she reported, but was not "significant enough to interfere with the claimant's ability to function on a daily basis. (Tr. 270). Doctor Maddux applied the DSM-IV to diagnose plaintiff, with Axis I as "major depressive disorder moderate." (Tr. 271).[29] Axis II was listed as "diagnosis deferred," and Axis III as "neurological problems." (Id. at 271). The consultant did not report a diagnosis for Axis IV or V, nor did he provide a GAF[30] score. (Id.).

Dr. Maddux noted that Ms. Montilla began mental health services at Inwood Clinic in May 2011. (Id. at 268). Plaintiff informed Dr. Maddux that she had weekly individual psychotherapy and monthly medication monitoring. (Id.). He recommended that plaintiff continue with psychiatric medication monitoring and

---

[29] The DSM-IV is the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition. It is a publication that lists assessment criteria for every mental disorder diagnosis. 1 Attorneys Medical Deskbook § 5:6. "The coding in the manual is used by psychiatrists, clinical psychologists, family therapists, psychiatric nurses, and all other mental health professionals. Health insurers and Medicare require this coding for reimbursement." 2 Attorneys Medical Deskbook § 25:51.10. Psychiatric diagnoses under the DSM-IV are structured along five axes. Axis I is the clinical coding of the specific psychiatric disorder; Axis II is any diagnosis of an underlying personality disorder; Axis III provides diagnosis of medical condition(s) affecting a mental disorder; Axis IV indicates the presence of any psychosocial or environmental problems affecting the care of the disorder; and Axis V is an assessment of overall functioning such as the GAF. 2 Attorneys Medical Deskbook § 25:51.10.

[30] GAF is the Global Assessment of Functioning Scale, from 1 to 100, by which a clinician rates a patient's ability to function. Scores above 80 is considered excellent functioning and 40 or below signifies dysfunction typical of hospitalized patents. 2 Attorneys Medical Deskbook § 18:10. See DSM-IV-TR 34.

psychotherapy. (Id. at 271). Dr. Maddux's prognosis was "fair given compliance with treatment." (Id.). In his evaluation of plaintiff's mental residual functional capacity ("RFC"), Dr. Maddux indicated that she had no impairments arising from her mental state. (Tr. 272-74).


### 4. Vocational Interrogatory

On September 22, 2011 Vocational Expert ("VE") Raymund E. Cestar responded to interrogatories and hypotheticals posed by ALJ Heyman. (Tr. 190-93). The interrogatories included a hypothetical person with the following traits:

> born on March 15, 1986, has a limited education and is able to communicate in English, . . . has work experience . . . [as a cashier and salesperson], . . . . has a residual functional capacity . . . to perform light work, . . . except no repetitive pushing, pulling, reaching with non-dominant [left upper extremity], simple repetitive tasks, no more than occasional contact with members of the public, no excessive respiratory irritants.

(Id. at 191). When asked whether the hypothetical person described above could perform the past jobs of plaintiff, Mr. Cestar answered, "no," and noted that her past occupations required frequent contact with the general public. (Id.). When asked whether the hypothetical person described above could perform any unskilled occupations that exist in the national economy, Mr. Cester listed three occupational titles and corresponding

Dictionary of Occupational Titles[31] Codes: School Bus Monitor, 372.667-042; Surveillance System Monitor, 379.367-010; and Usher, 344.677-018.[32]

## C. The ALJ's Decision

On November 18, 2011, ALJ Heyman rendered a decision finding that plaintiff is not disabled within the definition of the Act. (Tr. 6-18). The ALJ determined that Ms. Montilla was not disabled since her onset date of September 21, 2008.

Following the prescribed five-step approach to disability determination, the ALJ found at step one that the claimant had worked after the application date, but that this activity did not rise to the level of substantial gainful activity. (Tr. 11). At step two, the ALJ determined that Ms. Montilla suffered a severe impairment of neurological derangement, status post-electric shock. (Tr. 11). The ALJ determined that plaintiff's asthma was not severe, in that she did not allege it was disabling or that it

---

[31] The Dictionary of Occupational Titles ("DOT"), last published by the U.S. Department of Labor in 1991, provides basic occupational information in the United States Economy. The SSA, by regulation, relies on the DOT extensively to determine if jobs exist in the national economy for which a claimant is qualified, given his or her residual functional capacity. See, e.g. 20 C.F.R. §§ 404.1566-404.1569, 416.966-416.969.

[32] There is no code 344.677-018 in the DOT, although there is a code 344.677-014 corresponding to "usher." The occupational title "Usher" has four titles and codes related to it: 344.137-010 Usher, Head (amuse. & rec.), 344.667-010 ticket taker, 344.677-010 Press-box Custodian (amuse. & rec.), and 344.677-014 Usher (amuse. & rec.). 1 Dictionary of Occupational Titles 253.

limited her capacity for work, and she could not recall her last attack or hospitalization. (Id.).

At step three, the ALJ determined that the plaintiff's impairment was not contained in the listings in section 11.00, which pertains to neurological impairments.[33] Therefore, the ALJ found that the impairment did not meet the regulatory criteria for per se disability. (Tr. 12).

On step four, given the number of symptoms presented by Ms. Montilla, the ALJ assessed her residual functional capacity ("RFC"), finding she could perform light work[34] with additional limitations. (Tr. 12). The limitations are that plaintiff "cannot engage in repetitive pushing, pulling or reaching with non-dominant left upper extremity; the claimant is limited to simple repetitive tasks; the claimant cannot have more than occasional contact with members of the public; and the claimant cannot be exposed to excessive respiratory irritants." (Id.).

---

[33] The impairment listing is found in 20 CFR § 404, Subpt. P, App. 1, § 11.00. The categories included under section 11.00 include: (A) Epilepsy, (B) Brain tumors, (C) Persistent disorganization of motor function, (D) Episodic conditions such as multiple sclerosis or myasthenia gravis, (E) Multiple sclerosis, (F) Traumatic brain injury, and (G) Amyotrophic Lateral Sclerosis.
[34] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Light work might also involve, rather than frequent lifting, "a good deal of walking or standing, or when it involves sitting must of the time with some pushing and pulling o farm or leg controls." Light work incorporates all the capabilities of sedentary work. 20 C.F.R. §416.967.

ALJ Heyman performed a two-step process to determine Ms. Montilla's RFC. (Tr. 12). He explained that the first step in such a determination is to identify an underlying physical or mental impairment, shown by medically acceptable clinical or laboratory diagnostic techniques that can be reasonably expected to produce plaintiff's pain or other symptoms. (Id.). The second step is to evaluate the intensity, persistence, and limiting effects of the plaintiff's pain or other symptoms to determine the extent to which they limit functioning. (Id.). When symptoms are not substantiated by objective medical evidence, the ALJ indicated, he makes a finding as to the credibility of the claimant's statements based on the entire case record. (Id.).

ALJ Heyman determined that even though there was evidence of a medically determinable impairment, Ms. Montilla's "statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the medical evidence." (Tr. 13). Thus, the ALJ found that plaintiff's complaints of bladder incontinence, eye strain, inability to conceive, drowsiness, and stuttering all lacked credibility because of missing or inconsistent reports regarding these symptoms in the record. (Id.). Moreover, the ALJ noted that plaintiff is able to use public transportation, see her friends almost daily, follow written and spoken directions, and attend to

23

other aspects of daily living. (Id.). The ALJ reasoned that the "variety and extent of claimant's daily activities [were] probative evidence of the ability to perform a range of light work activities." (Id.).

Additional findings regarding plaintiff's credibility included the ALJ's observation that she is right-hand dominant, but that her impairment is mostly limited to her left side. (Tr. 13). He also cited her sporadic work history as evidence that her daily activities have at times been "somewhat greater than the claimant has generally reported." (Id.). The ALJ also explicitly downgraded Ms. Montilla's credibility regarding her mental health impairments because the Inwood Clinic, where she testified she had undergone psychotherapy, answered the ALJ's subpoena by reporting that she was never a patient there. (Id. at 16).

ALJ Heyman also made two findings regarding plaintiff's credibility that do not appear to be substantiated by the record. First, he observed that Ms. Montilla's testimony that she saw a doctor immediately following the incident is contradicted by the medical records, which indicate that she went to the emergency room days later. (Tr. 13).[35] The ALJ also seems to imply a lack of credibility owing to plaintiff having a nine-month gap in her

---

[35] We are unable to locate this reference in the hospital evidence.

24

treatment from her second visit to the New York Presbyterian Hospital in October 2008 until June 30, 2009, when she sought treatment at Jackson Memorial Emergency Room. (Id. at 14).[36]

With regard to the treating and consulting opinions in Ms. Montilla's case, the ALJ gave "some weight" to the opinions of treating physicians Dr. Krishna and Dr. Hauknecht, as well as to the opinion of Dr. Salon, the consultative physician. (Tr. 15). Specifically, he determined that plaintiff's residual functioning is limited, but not as restricted as opined by Dr. Krishna. (Id. at 14-15). The ALJ gave consulting psychologist Dr. Maddux's opinion that plaintiff suffered no mental health impairment "great weight," but nonetheless credited the plaintiff's statements that she is anti-social. (Id.). He did not evaluate the evidence provided by Dr. Acevedo. The ALJ concluded that, in addition to the physical limitations imposed on plaintiff's RFC for light work, there were limitations due to her mental RFC -- that she should do "only simple repetitive tasks . . . no more than occasional contact with members of the public based upon claimant's statements that she is anti-social." (Tr. 16). Based on these RFC findings, the

---

[36] The ALJ is in error on this point, as the record contains treatment notes from Dr. Jose Acevedo from February 2009. See section II.B.2 supra.

ALJ determined that plaintiff was precluded from doing the kind of work she listed in her previous-employment history. (Id.).

At step five, the ALJ considered the vocational evidence and adopted the VE's assessment that there are jobs in the economy fitting his RFC finding for plaintiff. (Tr. 17). Therefore, he concluded that given the plaintiff's age, education, work experience and residual functioning capacity, she is capable of making a successful adjustment to other work that is available in the national economy. (Id.).

## II.   ANALYSIS

### A. Standard of Review

When a claimant challenges the SSA's denial of SSI benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)); Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) (citing Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence supports the SSA's findings, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll, 705 F.2d at 642. While the ALJ need not resolve every conflict in the record, Miles v. Harris,

645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of non-disability, the SSA decision may not withstand challenge if the ALJ committed legal error. See Balsamo, 142 F.3d at 79. Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Ultimately, "[t]he record as a whole must be complete

and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz, 2007 WL 2745704, *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp.2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000)).

## B. Standards for Benefits Eligibility

An applicant is "disabled" within the meaning of the Act if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

twelve months." 42 U.S.C. § 1382c(a)(3)(A). To qualify for SSI benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(C); accord Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).[37]

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butts, 388 F.3d at 383 (quoting 42 U.S.C. § 423(d)(2)(A)); 42 U.S.C. § 1382c(a)(3)(B) (SSI)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnosis or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other

---

[37] In addition to being disabled as defined by the statute, the applicant must also demonstrate that she is financially eligible for benefits. See 42 U.S.C. § 1382(a); Tejada, 167 F.3d at 773 n.2.

witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams, 859 F.2d at 259.


The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described this sequential process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996)(emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983)); see 20 C.F.R. § 404.1520 (2015).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). Normally, in meeting her burden on this fifth step, the Commissioner may rely on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid[s]." Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). If, however, plaintiff suffers from non-exertional limitations, exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

**C. Assessment of the Record**

We assess the record and conclude that the ALJ's decision suffers from several defects that justify a remand for further development of the record and for findings supported by substantial evidence.

**1. The ALJ Failed to Develop the Record Fully.**

The ALJ always has a duty to develop the record, and that duty is "heightened" when the claimant proceeds pro se. Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)). Even when claimant is represented

33

by counsel, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran, 569 F.3d at 112 (internal quotation marks and brackets omitted) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir.2009)); accord Butts, 388 F.3d at 386; Pratts, 94 F.3d at 37; see also Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Moran, 569 F.3d at 112-13 (2d Cir. 2009) (internal quotation marks omitted) (quoting Butts, 388 F.3d at 386). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted). The ALJ must "adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered and by scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts" Moran, 569 F.3d at 113 (internal quotation marks and brackets omitted); accord Gold, 463 F.2d at 43.

Because ALJ bears the burden of ensuring that the record as a whole is "complete and detailed enough" to support his determinations, 20 C.F.R. § 404.1513(e)(1)-(3), he is required to

34

seek additional evidence to clarify inconsistencies, ambiguities, and conflicts in the record. § 404.1513(e)(1). Indeed, an ALJ commits legal error when he rejects a medical assessment without having first sought to develop fully the factual record. Rosa, 168 F.3d at 80. The ALJ may even be required to develop the claimant's medical history for a period longer than the twelve-month period prior to the date on which the claimant filed if there is reason to believe that such information is necessary to reach a decision. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). See Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp.2d 330, 343 (E.D.N.Y. 2010); see also Pino v. Astrue, 2010 WL 5904110, *18 (S.D.N.Y. Feb. 8, 2010).

When inconsistencies, ambiguities, or lacunae in the evidence from the claimant's treating physicians make that evidence "inadequate for [the ALJ] to determine whether [claimant] is disabled, . . . [the ALJ] will first recontact [claimant's] treating physician . . . to determine whether the additional information . . . is readily available." 20 C.F.R. § 404.1512(e)(1). If there is an ambiguity regarding whether a treating physician's statement bears on the alleged period of disability, the ALJ must seek to resolve this ambiguity through additional medical evidence. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)(citing 20 C.F.R. § 404.1512(e)). In addition, the ALJ cannot reject a treating physician's diagnosis without first

attempting to fill any clear gaps in the administrative record. See Rosa, 168 F.3d at 80 (citing Clark, 143 F.3d at 118); see also Calzada v. Astrue, 753 F. Supp.2d 250, 278 (S.D.N.Y. 2010)("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion.").

For the reasons below we find that ALJ Heyman failed to develop the record with regard to treatment providers named by plaintiff but otherwise absent from the record, and with regard to medications prescribed for plaintiff by a treating physician. This missing evidence must be clarified on remand for there to be an evaluation of plaintiff's disability status conducted in accordance with the regulations implementing the Act.

### a. Records for Treatment by Jason Maas and Dr. Sangita Shah

Among the exhibits included in the record that ALJ Heyman reviewed in making his determination were two forms entitled "Claimant's Recent Medical Treatment" and "Claimant's Medications," both of which are undated but clearly completed by Ms. Montilla and submitted after February 20, 2010. (Tr. 183, 187;

36

see id. at 20). The former identifies two "doctors," Sangita T. Shah and Jason John Maas, provides addresses for them, and indicates that these treatment providers told her that her "conditions are permanent." (Id. at 183; see discussion, sections I.B.2.d & f, supra). The latter specifies medications prescribed by them in October and December of 2010 that are consistent with treatment for the symptoms that plaintiff described at her hearing related to muscle spasms and headaches with light sensitivity. (Id. at 187; see discussion sections I.B.2.d & f supra).

Additionally, we note that a Dr. Shah was listed as the referring physician for neurological testing conducted by Dr. Acevedo in February 2009. (Tr. 221). And, as we discussed in section I.B.2.d, supra, Mr. Maas appears to be a physician assistant employed in Dr. Hausknecht's practice. Plaintiff specifically described the medication, dosage, and date of a prescription from Mr. Maas that is a year after the last treatment record provided from Dr. Hausknecht, suggesting that the treatment records for Ms. Montilla from Dr. Hausknecht's office are incomplete.

There is no indication in the record that ALJ Heyman asked plaintiff for more information about these two treatment providers, or the prescriptions that she reported having received

from them. Nor is there any indication that the ALJ attempted to supplement the record by issuing subpoenas to these providers, even though their addresses were provided.

The ALJ had a heightened duty to develop the record with regard to these two treatment providers, and appears to have fallen short in this respect. Moreover, without this information, a determination of plaintiff's disability status is not possible.

### b. Ms. Montilla's Eye Examination

Plaintiff repeatedly testified at her hearing to having headaches and light sensitivity emanating from her left eye. (Tr. 34, 37, 38, 48). She also testified that she had an upcoming appointment with an eye specialist named Dr. Milages (phonetic from transcript) to examine her eye problems. (Id. at 39). There is no indication in the record that the ALJ followed up on this information by requesting records from the plaintiff's imminent visit, and yet he downgraded her credibility in part by stating that she "ha[d] not seen an ophthalmologist for this alleged condition." (Id. at 13). Here, as well, ALJ Heyman had a duty to develop the record regarding medical treatment that this pro se plaintiff brought to his attention, and any evaluation of plaintiff's alleged eye and headache conditions would require an

attempt to collect treatment records and an opinion from this eye specialist.

### c. Inconsistencies in Dr. Acevedo's Records

The record includes treatment notes from Dr. Jose Acevedo, who treated Ms. Montilla in February of 2009. (See discussion section I.B.2.b supra). Among the records provided by Dr. Acevedo from around the date of plaintiff's appointment, are photocopies of prescriptions written for drugs consistent with plaintiff's illness, but for a patient whose name is not Ms. Montilla's. (Tr. 214). ALJ Heyman had a clear duty to reach out to Dr. Acevedo and clarify this inconsistency in the files he provided, but there is no indication that he did so.

### d. Psychotherapy Treatment

There is an additional aspect of the record that the Commissioner should attempt to develop on remand. First, plaintiff informed the ALJ that she had begun treatment with a psychotherapist, and she reported the same information during her consultative exam with Dr. Maddux ordered by the ALJ. (Tr. 46, 268). The ALJ had an obligation to at least ask plaintiff at her hearing for information about her psychotherapy appointment and then attempt to gather records of her treatment if possible.

39

### 2. The ALJ Erred in Applying the Treating-Physician Rule.

Social Security regulations and Second Circuit precedent require the ALJ to place presumptive weight on the opinions of treating physicians:

> Generally we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The federal regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527. "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). Among such medically acceptable techniques, "[a] patient's report of complaints, or history, is an essential diagnostic tool." Green-

40

Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)(quoting
Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).


Typically, the treating physician's opinion is not afforded
controlling weight if it is inconsistent with the other medical
experts' opinions and not otherwise supported by record evidence.
Burgess, 537 F.3d at 128; Halloran v. Barnhart, 362 F.3d 28, 32
(2d Cir. 2004); Snell, 177 F.3d at 133. "[A]nd the report of a
consultative physician may constitute such evidence." Marquez v.
Colvin, 2013 WL 5568718, *12 (S.D.N.Y. Oct. 9, 2013)(quoting
Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983)). "However,
not all expert opinions rise to the level of evidence that is
sufficiently substantial to undermine the opinion of the treating
physician." Burgess, 537 F.3d at 128.


If an ALJ does not afford the treating physician's opinion
controlling weight, he must provide "good reasons" for declining
to do so, as well as "good reasons" for according those opinions
whatever weight he assigns to them. Clark v. Comm'r of Soc. Sec.,
143 F.3d 115, 118 (2d Cir. 1998); 20 C.F.R. §§ 404.1527(c)(2),
416.927(c)(2) ("We will always give good reasons in our notice of
determination or decision for the weight we give your treating
source's opinion."). Key factors that the ALJ "must consider"
include:

> (i) the frequency of examination and the length,
> nature and extent of the treatment relationship; (ii)
> the evidence in support of the treating physician's
> opinion; (iii) the consistency of the opinion with the
> record as a whole; (iv) whether the opinion is from a
> specialist; and (v) other factors brought to the
> Social Security Administration's attention that tend
> to support or contradict the opinion.

Halloran, 362 F.3d at 32 (citing 20 C.F.R. §§ 404.1527(c),

416.927(c)); accord Clark, 143 F.3d at 118. Moreover, the ALJ may

not simply rest on the inadequacy of a treating physician's report

to deny that report controlling weight. The Second Circuit has

held that "the lack of specific clinical findings in the treating

physician's report did not, standing by itself, justify the ALJ's

failure to credit the physician's opinion. . . . [I]t was the ALJ's

duty to seek additional information from the treating physician

sua sponte." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)

(citing Perez, 77 F.3d at 47).


Finally, the Commissioner reserves the authority to issue the

opinion on whether a claimant is "disabled." Therefore, neither a

treating physician's opinion nor that of a consultative physician

is controlling on such determinations. 20 C.F.R. §§ 404.1527(d),

416.927(d).


While we find that ALJ Heyman did not err in the way he

evaluated the treating physicians he addressed in his decision, he

did not address at all one of plaintiff's treating physicians.

Additionally, as we discussed in section II.C.1, supra, on remand, once the Commissioner has developed the record completely to include any available records from other treatment providers, there may be a need to evaluate those providers in accordance with the treating-physician rule.

### a. The ALJ Failed to Address Dr. Acevedo's Notes and Opinion

The record contains treatment records from Dr. Jose Acevedo, who examined plaintiff on February 4, 2009 and provided a follow-up report with test print-outs for two nerve tests conducted on Ms. Montilla. (Tr. 214-24). However, ALJ Heyman does not address this evidence in his decision. Indeed, the ALJ refers to a nine-month treatment gap between her October 2008 visit to New York Presbyterian Hospital and her June 2009 visit to Jackson Memorial Hospital (id. at 14), when the record contains evidence that Dr. Acevedo's treated plaintiff in February 2009.

We have already recommended that the case be remanded for the Commissioner to seek the proper prescription records from Dr. Acevedo. (See section II.C.1.c, supra). We further note that Dr. Acevedo saw plaintiff on referral from a Dr. Shah. (Tr. 215, 221). It is not clear whether this is the same Dr. Shah whom plaintiff identified as a treating physician in the forms she submitted

43

updating medical treatment records. (See sections I.B.2.f & II.C.1.a, supra). On remand, should this prove to be a reference from the same Dr. Shah as plaintiff named, we surmise that the treatment plaintiff received from Dr. Acevedo is essential to a proper evaluation of the opinions from plaintiff's treating physicians. Even if Dr. Acevedo's treatment of Ms. Montilla is isolated and unrelated to other treatment she received, the Commissioner must nonetheless address the evidence provided and either attribute controlling weight to it or provide "good reasons" for the weight it is given in her determination.

### b. The ALJ Sufficiently Evaluated the Evidence Provided by the Hospitals.

ALJ Heyman identified the following treatment providers in his decision: New York Presbyterian Hospital, Jackson Memorial Hospital, Dr. Hausknecht, and Dr. Krishna. (Tr. 13-14). While this is not a complete list and must be supplemented on remand (see discussion, section II.C.1, supra), the ALJ's evaluation and weighting of the evidence from the hospitals comports with the regulatory and legal requirements.

The two sets of hospital records are addressed completely. No indication is given that the ALJ gave this evidence less than controlling weight in his decision, and in any event, the objective

44

medical evidence reported by both hospitals is of normal neurological functioning. (Tr. 13-14). That is to say, the ALJ's determination that plaintiff is limited by weakness in her left-side upper body strength (id. at 12) is not inconsistent with the hospital records. Therefore, we can infer that the ALJ gave controlling weight to this evidence.

### c. Dr. Hausknecht's Records, in Addition to being Incomplete, Need Reconsideration.

Dr. Aric Hausknecht's treatment notes regarding Ms. Montilla's neurological limitations, to the extent that they are included in the record,[38] are fully recounted in the ALJ's decision. (Id. at 14). He properly noted that he did not give any weight to Dr. Hausknecht's opinion that plaintiff was "disabled," as that is a judgment reserved for the Commissioner. (Tr. 14). However, immediately after this qualification, the ALJ added that "Dr. Hausknecht did not comment specifically on the extent of the claimant's alleged restriction." (Id.). Since there is no other statement that can be understood as a reason to give Dr. Hausknecht's opinion less than controlling weight, we suspect that this statement serves that purpose. And as such, this statement

---

[38] We believe that these records may be missing prescriptions written by Physician Assistant Jason Maas. (See section II.C.1.a supra).

cannot suffice to give Dr. Hausknecht's opinions other than
controlling weight.

We find that the ALJ's evaluation of Dr. Hausknecht's evidence
is insufficient because it is not clear to us from the ALJ's
decision whether he attributed controlling weight to Dr.
Hausknecht or something less than controlling weight. See, e.g.,
Ferraris, 728 F.2d at 587 ("we do believe that the crucial factors
in any determination must be set forth with sufficient specificity
to enable us to decide whether the determination is supported by
substantial evidence."). The ALJ's determination that plaintiff
had limitations in her left upper body strength (id. at 12) appears
to be informed in part by Dr. Hausknecht's report of pain-related
weakness in her "left upper extremity." (Id. at 14).

Additionally, the ALJ's statement that this physician did not
opine on the extent of Ms. Montilla's restriction can be
interpreted as an indication that the ALJ downgraded the weight of
Dr. Hausknecht's evidence even though he was a treating physician.
See, e.g., SSR 96-2p (stating that, among the required factors in
the treating-physician rule, only a "medical opinion" as defined
by 20 C.F.R. §§ 404.1527(a), 416.927(a) provided by a treating
source will be given controlling weight). Clearly Dr. Hausknecht
treated plaintiff at least twice -- the exact extent of this

treatment only to be known once the Commission seeks clarifying information regarding any further treatment provided by the doctor through Physician Assistant Maas (see section II.C.1.a, supra) -- and determined through documented clinical tests that Ms. Montilla required restrictions in her activities. (Tr. 238-40). If the ALJ required a more specific explanation by Dr. Hausknecht of plaintiff's limitations, he was required to contact the doctor and seek such clarification before dismissing the evidence as unspecific. See, e.g., Schaal, 134 F.3d at 505. Only with such additional efforts and a clear explanation would the Commissioner, if applicable, be able to disregard Dr. Hausknecht's evidence as inadequate to serve as the opinion of a treating physician.

On remand, in addition to seeking full treatment records from Dr. Hausknecht and his physician assistant, the Commissioner should seek clarification from the doctor regarding his opinion on the extent of the claimant's alleged restrictions.

### d. Reconsideration of Dr. Krishna's Findings May be Necessary after the Commissioner Acquires Missing Evidence.

After recounting the evidence in Dr. R.C. Krishna's records, the ALJ assigned only "some weight" to this treating physician's opinions and indicated that he limited plaintiff's RFC to reflect the doctor's opinions regarding her limited ability to "bend[],

twist[], lift[], climb[] stairs, operat[e] heavy machinery." (Id. at 14-15). In reaching this determination, ALJ Heyman stated that Dr. Krishna (1) had reported symptoms not found elsewhere in the record and (2) had based his report on test results of disc herniations and degeneration in the cervical and lumbar spines that were not consistent with the rest of the record. (Id.). The ALJ also stated that the tests reports on which Dr. Krishna based his opinion were not provided. (Id. at 14).

Dr. Krishna reported that plaintiff was undergoing chiropractic and physical therapy treatment. (Id. at 278, 282). However, Dr. Krishna did not identify these providers, and Ms. Montilla did not testify to, or otherwise provide documentation of, chiropractic or physical therapy. Such complementary treatment sources can be important sources for the Commissioner to weigh in her decision, particularly given that here they might provide support for this treating physician, whose opinion the ALJ found to be inconsistent with the remainder of the record. See SSR 06-03p.[39] However, we note that the ALJ twice issued a subpoena to

---

[39] While neither chiropractors nor physical therapists are considered "acceptable medical source[s]," the SSA will, under 20 C.F.R. §§ 404.1513(d), 416.913(d), use evidence from such sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p. The evidence from "other sources," such as the chiropractor and physical therapist who purportedly treated plaintiff, cannot establish the existence of a medically determinable impairment -- only an "an acceptable medical source" such as Dr. Krishna could do that -- but they can provide insights, "based on the special knowledge of the individual," that they have acquired through their treatment. Id. Indeed, courts have reviewed

Westchester Medical Care, where Dr. Krishna examined plaintiff, on April 28, 2011 and on July 29, 2011 (Id. at 101, 104), thus plainly fulfilling his duty to seek clarification and missing evidence from this treating physician. See Schaal, 134 F.3d at 505. Additionally, the ALJ appropriately gave no regard to Dr. Krishna's opinion that plaintiff is disabled, as that determination is in the purview of the Commissioner alone. 20 C.F.R. §§ 404.1527(d), 416.927(d).

We have one caveat in accepting the ALJ's weighting of Dr. Krishna's evidence. The ALJ's evaluation of Dr. Krishna's findings rested in part on its asserted lack of consistency with the other evidence in the record. (Tr. 15-16)("The medical evidence combined with the claimant's testimony supports a finding that the claimant can engage in light work . . . but does not warrant a finding as restrictive as that opined by Dr. Krishna."). We have recommended that the Commissioner supplement the record with evidence from other treating physicians, whose treatment records were either not included in the record or else ignored by the ALJ. (See section II.C.1, surpra). Upon remand, if the Commissioner finds that newly

---

and remanded ALJ decisions for failing to consider the evidence provided by "other sources." See Baron v. Astrue, 2013 WL 1245455, *26 (S.D.N.Y. Mar. 4, 2013) report and recommendation adopted, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013)(listing cases supporting the court's power to find error when ALJs had not given appropriate weight to social workers, nurse practitioners, and similar "other source" evidence).

acquired and newly evaluated evidence is consistent with Dr. Krishna's opinions, then it will be necessary to reconsider the weighting ALJ Heyman attributed to Dr. Krishna's opinion.

### 3. Credibility Assessment

The SSA regulations require the ALJ to assess the claimant's credibility in a systematic way and to take seriously the claimant's report of subjective symptoms. 20 C.F.R. § 404.1529. In doing so, the ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions, and her resulting limitations. See, e.g., Schultz, 2008 WL 728925 at *12 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). If the ALJ's findings are supported by substantial evidence, a reviewing court must uphold his decision to discount the claimant's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135 (stating that an ALJ is in a better position to decide credibility than the Commissioner). Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective

medical evidence, it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)). The ALJ must consider "all of the available evidence" concerning a claimant's complaints of pain when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a).

An ALJ must apply a two-step process to evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the... symptoms alleged by the claimant." Martinez, 2009 WL 2168732 at *16 (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v.

Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. §
404.1529(c)(3)(i)-(vii)) and Taylor v. Barnhart, 83 F. App'x 347,
350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain
contentions are not substantiated by the objective medical
evidence,' the ALJ must evaluate the claimant's credibility."
Peck, 2010 WL 3125950 at *4 (citing 20 C.F.R. § 404.1529(c)); see
also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. §
404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis
may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501,
*14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether
objective evidence, on its own, substantiates the extent of the
alleged symptoms (as opposed to the question in the first step of
whether objective evidence establishes a condition that could
'reasonably be expected' to produce such symptoms)." Id. "Second,
if it does not, the ALJ must gauge a claimant's credibility
regarding the alleged symptoms by reference to the seven factors
listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id.
(citing Gittens v. Astrue, 2008 WL 2787723, *5 (S.D.N.Y. June 23,
2008)). If the ALJ does not follow these steps, remand is
appropriate. Id. at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7p. These include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p).

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis . . . [because requiring] plaintiff to fully substantiate [his] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue,

2009 WL 2356118, *10 (S.D.N.Y. July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, *7 (S.D.N.Y. Mar. 18, 1999)).

ALJ Heyman found that plaintiff's statements regarding her symptoms were not credible beyond what was supported by the medical evidence in the record. (Tr. 13). Specifically, the ALJ found that there was no medical evidence to support Ms. Montilla's claims that she experienced bowel and bladder incontinence, suffered light sensitivity and headaches from her left eye, and experienced infertility and drowsiness from her medications. (Id.). Additionally, he found that the "variety and extent of [her] daily activities are probative evidence of the ability to perform a range of light work activities." (Id.).

While the ALJ has supported his credibility findings with sufficient detail and attention to the factors specified in the regulations and caselaw, it is nonetheless unacceptable because it is based on a record that has not been properly and fully developed. (See discussions, sections II.C.1 & 2, supra). For instance, the ALJ indicated that plaintiff's complaints about eye trouble were not credible because she had not seen an ophthalmologist; however, as we noted, she testified that she had an appointment to see an eye doctor and the ALJ did not attempt to

collect evidence regarding that treatment visit.[40] Additionally, the ALJ's reasoning relies on some factual errors that should be corrected. First, he indicated that no medical evidence supports her testimony that she suffered from incontinence; however, Dr. Salon stated in his report that she had raised that symptom with him. (Tr. 217). Second, the ALJ relied upon what he believed to have been a nine-month gap in plaintiff's treatment, but he neglected to consider Dr. Acevedo's treatment during that time span. (See discussion section II.C.2.a supra). Third, although the ALJ relied on the fact that Ms. Montilla had not sought certain treatment, he did not address the explanation found in Dr. Hausknecht's records that she lacked insurance coverage and could not afford her medications. (Tr. 238). See SSR 96-70 (requiring ALJs to accept an individual's inability to afford treatment as a legitimate explanation for a failure to seek treatment).

Having already recommended that this matter be remanded for the Commissioner to fully develop the record and provide an evaluation for the evidence provided by each treating physician,

---

[40] We note that plaintiff underwent several consultative examinations after the hearing but before the ALJ issued his decision. (See Tr. 55, 257-74). Accordingly, there is no justification for the ALJ failing to follow up post-hearing as to plaintiff's treatment for ocular problems.

we expect that the credibility determination will also need to be revisited in the light of any supplementated record.

### 4. The Vocational Capacity Evaluation Also Requires Reconsideration.

The occupational evidence provided by the vocational expert "generally should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles ('DOT'), published by the Department of Labor]." SSR 00-4p. See also McAuliffe v. Barnhart, 571 F. Supp.2d 400, 407 (W.D.N.Y. 2008). If there is an "unresolved conflict between [vocational expert] evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Id.

We note at the outset that the ALJ was correct to consult a vocational expert, because the Grids did not apply directly to this plaintiff. (Tr. 17). In seeking the opinion of the VE, ALJ Heyman presented a hypothetical based on the RFC that he had determined for plaintiff -- light work with additional limitations based on her impairments. (Tr. 17, 191). These impairments included "no more than occasional contact with members of [the] public.] (Id. at 191). In response the VE cited three positions that appear

in sufficient numbers in the economy and purportedly meet the limitations prescribed by the ALJ: school bus monitor (DOT Code 372.667-042),[41] surveillance system monitor (DOT Code 379.367-010),[42] and usher (DOT Code 344.677-01[4]).[43]

The DOT supplies a definitional trailer for each job code providing information on the Guide for Occupational Exploration Code ("GOE"), Specific Vocational Preparation ("SVP"), General Education Development ("GED"), and Physical Demands required as a minimum for that job. 2 Dictionary of Occupational Titles 1009-14. In particular, the GOE trailer ties a specific job code to the guide "designed by the US Employment Service to provide career counselors and other DOT users with additional information about

---

[41] The function of this job position is defined as follows: "[m]onitors conduct of students on school bus to maintain discipline and safety; Directs loading of students on bus to prevent congestion and unsafe conditions. Rides school bus to prevent altercations between students and damage to bus. Participates in school bus safety drills. May disembark from school bus at railroad crossings and clear bus across tracks." 1 Dictionary of Occupational Titles 269.

[42] A person in this position "[m]onitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is development, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions." 1 Dictionary of Occupational Titles 281.

[43] An usher "[a]ssists patrons at entertainment events to find seats, search for lost articles, and locate facilities, such as restrooms and telephones. Distributes programs to patrons. Assists other workers to change advertising display." 1 Dictionary of Occupational Titles 253. See discussion p. 15 supra regarding the apparent typographical error on the DOT Code for usher.

the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations." Id. at 1013. In its publication "Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles," the U.S. Department of Labor provided an explanation for the taxonomy of six-digit codes that comprise the GOE number in the DOT trailer. U.S. Department of Labor, Employment and Training Administration, 1993.

Two of the jobs that the VE recommended for plaintiff -- Surveillance System Monitor and School Bus Monitor -- were classified as GOE 04.02.03 in their DOT Code trailer. The first four digits, 04.02, have the following significance:

> 04.02 Security Services. Occupations in this group are concerned with protecting people, animals, and physical property. . . . Skills and abilities required include: . . . using reason and judgment to deal with people in different kinds of situations. . . .

Selected Characteristics 45. As for the Usher job, it has the GOE 09.05.08, which is defined in relevant part:

> 09.05 Attendant Services. Occupations in this group are concerned with performing services for patrons and/or customers. . . . Skills and abilities required include . . . getting along with different types of people.

Id. at 367. Considering the specific limitation that Ms. Montilla would not be able to perform a job that required more than limited contact with the general public, it appears that the VE's specified job openings are inconsistent with the RFC findings. At the very least, the ALJ failed even to attempt to reconcile the apparent conflict between his findings and the cited requirements of the jobs mentioned by the VE.

Even if we were not already recommending that this matter be remanded for further consideration by the Commissioner, the vocational determination, in which the burden is on the Commissioner, is unacceptable and must be redone to comport with plaintiff's actual RFC. Moreover, once the Commissioner has properly developed the record and weighed the evidence from the treating physicians, it is possible that a finding of disability will be made, or a revised determination of plaintiff's RFC. If the latter is the case, the Commissioner is directed to arrive at a vocational determination that matches the new RFC.

## III.  CONCLUSION

For the foregoing reasons, we recommend that defendant's motion for judgment on the pleadings be denied, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion. Specifically, the Commissioner should seek to

develop the record with regard to the treatment providers Jason Maas, Dr. Sangita Shah, eye specialist Dr. Milages, and Dr. Acevedo. The Commissioner should then reconsider her weighting of the opinions provided by each treating physician in light of the entire record. Depending on the results of these efforts, a proper vocational determination, adhering to plaintiff's RFC, should be made as well.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Laura Taylor Swain, Room 1320, 500 Pearl Street, New York, New York 10007-1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: New York, New York
       May 14, 2015

                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




Copies of this Report & Recommendation have been sent today to:

Ms. Sowany Montilla
375 E. 209th Street, #3C
Bronx, NY 10467

Joseph A. Pantoja, Esq.
Assistant United States Attorney
   Southern District of New York
86 Chambers Street
Third Floor
New York, New York 10007